# No. 23-7246

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

ASCENT PHARMACEUTICALS, INC.,

Petitioner,

v.

UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,

Respondent.

---

**RESPONSE TO EMERGENCY MOTION FOR MANDATORY
PRELIMINARY INJUNCTIVE RELIEF**

---

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

MARK B. STERN
URJA MITTAL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7248*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-4895*

## INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 27(a)(3), the United States Drug Enforcement Administration (DEA) respectfully files this opposition to petitioner Ascent Pharmaceuticals, Inc.'s emergency motion for an injunction pending appeal, which asks this Court to "direct[] DEA to approve Ascent's requested quotas" for controlled substances that Ascent uses to manufacture drugs. Ascent meets none of the prerequisites for extraordinary relief, and its motion should be denied.

This case concerns the quotas that the government sets for the production and procurement of controlled substances under the Controlled Substances Act. Under the Act, the Attorney General, through DEA, establishes quotas for the quantities of controlled substances that are manufactured in the United States each year and that may obtained by different entities for approved purposes. Pharmaceutical manufacturers that use controlled substances must register with DEA and seek the agency's approval to obtain fixed quantities of controlled substances, known as procurement quotas, each year. DEA decides whether to grant, in whole or in part, or deny each quota application. A manufacturer that disagrees with the agency's initial quota decision may seek a hearing on the decision before an administrative law judge. Following the hearing, the administrative law judge issues a recommended decision, which is followed by a final order from the DEA Administrator with findings of fact and conclusions of law. If the manufacturer is dissatisfied with the Administrator's

final decision on the quota application, the manufacturer may seek review of that decision in a court of appeals. 21 U.S.C. § 877.

In 2022, petitioner Ascent Pharmaceuticals, Inc. applied for procurement quotas for several controlled substances. At the same time that the agency was evaluating Ascent's quota applications, DEA uncovered extensive recordkeeping violations at the company as part of a separate DEA investigation. As a result of these recordkeeping violations, DEA found that it was unable to track millions of dosage units of controlled substances that Ascent had been permitted to procure in the past. DEA accordingly served Ascent with an order to show cause why Ascent's DEA registrations should not be revoked. That order was served on September 28, 2023. The next day, DEA served Ascent with its initial decision denying Ascent's procurement quota applications. Ascent has not sought an administrative hearing on the initial quota decision or the order to show cause. Instead, Ascent filed a petition for review of DEA's initial quota decision in this Court and an emergency motion for an injunction pending appeal directing DEA to approve Ascent's quota applications.

Ascent's motion is extraordinary in every respect. The exclusive administrative review process is integral to protecting the interests of DEA, the public, and registrants. The process allows the registrant an opportunity to present further evidence and argument to the expert agency and gives the Administrator the opportunity to issue a final decision with findings of fact and conclusions of law. Judicial review, in turn, is predicated on scrutiny of the Administrator's decision and

2

the underlying record, and the Administrator's findings of fact, "if supported by substantial evidence, shall be conclusive." 21 U.S.C. § 877. Ascent's request that the Court "direct[] DEA to approve Ascent's requested quotas," without an administrative record or final Administrator decision is flatly at odds with the statute and detrimental to the public interest, and therefore should be denied.

## STATEMENT OF THE CASE

### A.　　Statutory and Regulatory Background

**1.** Pursuant to the Controlled Substances Act, DEA establishes quotas for the procurement and manufacturing of controlled substances. 21 U.S.C. § 826. These quotas limit the production and distribution of the controlled substances with the highest degree of abuse potential—those that are listed in Schedules I and II—to the quantity of each such substance that is needed for legitimate medical and scientific purposes. *See Phenmetrazine Quotas—1977*, 43 Fed. Reg. 6169, 6171 (Feb. 13, 1978).

Each year, DEA establishes aggregate production quotas, individual manufacturing quotas, and procurement quotas for Schedule I and II controlled substances. An aggregate production quota establishes the maximum amount of a controlled substance that may be manufactured by all bulk manufacturers of that substance in the United States. 21 U.S.C. § 826(a)(1); 21 C.F.R. § 1303.11(a). An individual manufacturing quota establishes the maximum amount of a controlled substance that may be produced by a particular firm that is registered to manufacture that substance. 21 U.S.C. § 826(b)–(c); 21 C.F.R. § 1303.21(a). Registered

3

pharmaceutical manufacturers may apply to DEA each year for procurement quotas, which set the maximum amount of each controlled substance that may be acquired by that manufacturer to produce dosage form pharmaceutical drugs, or to package or label those drugs. 21 U.S.C. § 826(c); 21 C.F.R. § 1303.12(a). The agency may request additional information from the applicant that "may be helpful in detecting or preventing diversion" of the controlled substances. 21 C.F.R. § 1303.12(b).

Following the application process, the agency issues an initial decision on the issuance, adjustment, suspension, or denial of its procurement quota. 21 C.F.R. § 1303.34(a). The applicant may request a hearing on the agency's initial decision within 30 days. *Id.* The hearing provides the applicant with the opportunity to present factual evidence and argument regarding the issuance, adjustment, suspension, or denial of the quota. *Id.* § 1303.32(b). The hearing is overseen by an administrative law judge, who certifies a record and prepares recommended findings of fact and conclusions of law and a recommended decision. *Id.* §§ 1303.31(b), 1316.65(a)–(c). The applicant or agency may file exceptions to the recommended decision, findings of fact, and conclusions of law. *Id.* § 1316.66(a)–(c). The Administrator then issues a final order on the quota application, which includes findings of fact and conclusions of law. *Id.* §§ 1303.37, 1316.67.

The Controlled Substances Act provides for direct review of the Administrator's final decision in the court of appeals. 21 U.S.C. § 877 ("All final determinations, findings, and conclusions of the Attorney General under this

4

subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located . . . ."). The Act specifies that "[f]indings of fact by the Attorney General, if supported by substantial evidence, shall be conclusive." *Id.*

**2.** The Controlled Substances Act also establishes registration requirements for the manufacturers and distributors of controlled substances, as well as other entities. 21 U.S.C. §§ 823, 958. The Attorney General "shall register an applicant to manufacture controlled substances in schedule I or II if," among other things, "he determines that such registration is consistent with the public interest." *Id.* § 823(a). In determining whether a registration is consistent with the public interest, the Attorney General must consider several factors, including "past experience in the manufacture of controlled substances," "the existence in the establishment of effective control against diversion," and "such other factors as may be relevant to and consistent with the public health and safety." *Id.* § 823(a)(5)–(6).

The Administrator may suspend or revoke a registration, in whole or in part, for a variety of reasons, including if the registrant "has committed such acts as would render his registration … inconsistent with the public interest" under 21 U.S.C. § 823. 21 U.S.C. § 824(a)(1)–(5); *see also* 21 C.F.R. § 1301.36(a)–(c). Before revoking or suspending a registration, the Administrator must issue an order to show cause why

5

the registration should not be revoked or suspended. 21 U.S.C. § 824(c); 21 C.F.R. § 1301.36(d). The order to show cause must state the basis for the denial, revocation, or suspension, direct the registrant to appear before the agency at the time and place stated in the order, and notify the registrant of the opportunity to submit a corrective action plan on or before the date of appearance. 21 U.S.C. § 824(c)(2); 21 C.F.R. § 1301.37(c). Upon review of any corrective action plan, the agency shall determine whether the denial, revocation, or suspension proceedings should be discontinued or instead deferred while the plan is modified or clarified. 21 U.S.C. § 824(c)(3). The suspension or revocation of a registration operates as a suspension or revocation of any quota under the Act. *Id.* § 824(e).

A party may also request a hearing on the order to show cause within 30 days of receiving the order. 21 C.F.R. § 1301.37(d)(1). The agency must then hold a hearing on the order to show cause, *id.* § 1301.36(d), and the party must file an answer specifically responding to each of the allegations in the order to show cause, *id.* § 1301.37(d)(2)–(4). *See also id.* §§ 1301.41–.46 (hearing procedures for the denial, revocation, or suspension of registrations).

**3.** The Controlled Substances Act also imposes recordkeeping requirements. Registrants who manufacture or distribute controlled substances must "maintain, on a current basis, a complete and accurate record of each such substance manufactured, received, sold, delivered, or otherwise disposed." 21 U.S.C. § 827(a)(3); 21 C.F.R. §§ 1304.21(a), 1304.03(a). A manufacturer must keep records of the manufacture of

6

finished dosage forms, including "[t]he number of units of finished forms and/or commercial containers distributed or disposed of in any other manner by the registrant . . . including the date and manner of distribution or disposal, the name, address, and registration number of the person to whom distributed, and the quantity in finished form distributed or disposed." 21 C.F.R. § 1304.22(a)(2)(ix).

Registrants must track the distribution of Schedule I and II controlled substances on DEA Form 222, and it is unlawful to distribute a Schedule I or II controlled substance without a written order recorded on a DEA Form 222. 21 U.S.C. § 828(a); 21 C.F.R. § 1305.03. Various regulations govern how the DEA Form 222 must be completed and maintained and how orders are to be filled pursuant to the forms. *See* 21 C.F.R. §§ 1305.12–.13, 1305.15.

### B. Factual Background

**1.** Ascent Pharmaceuticals, Inc., is a generic pharmaceutical company in Central Islip, New York, that is registered with DEA as a dosage form manufacturer and as an analytical lab. Jayaraman Decl., Ex. 12, ¶¶ 1–2 (OSC).[1] Ascent uses controlled substances to manufacture pharmaceutical drugs for sale to Camber Pharmaceuticals Inc., which promotes, markets, distributes, and sells drugs manufactured by Ascent. OSC ¶ 3. Ascent distributes the controlled substances to Camber's customers via a distributor named R&S Solutions. OSC ¶¶ 4–5.

---

[1] DEA's order to show cause is attached to Ascent's emergency motion, *see* Dkt. No. 8, as Exhibit 12 to the Jayaraman Declaration and cited herein as "OSC."

In 2022, Ascent applied to DEA for procurement quotas for 2023 for 11 controlled substances. Mot. 4. According to Ascent, five of these controlled substances—desmethylphenidate, methylphenidate, lisdexamfetamine, d,l-amphetamine, and d-amphetamine—are used to make eight different medications for attention-deficit/hyperactivity disorder (ADHD). *Id.*

Between May and August 2022, as part of a separate investigation initiated by a DEA field office, DEA investigators conducted two on-site audits of Ascent, which uncovered extensive recordkeeping violations, finding that millions of dosage units of controlled substances that were unaccounted for in Ascent's records. OSC ¶ 7. In May 2023, the agency's investigators "concluded that outstanding discrepancies and deficiencies in the documentation prevented them from being able to complete the accountability audit." OSC ¶ 13. DEA sought additional documents from Ascent but was "unable to resolve multiple discrepancies," leading the agency to conclude that Ascent "did not properly maintain records sufficient to account for its manufacture and distribution of controlled substances in a readily retrievable manner," in violation of the Controlled Substances Act. OSC ¶¶ 14–15.

**2.** On Thursday, September 28, 2023, DEA served Ascent with an order to show cause why DEA should not revoke Ascent's DEA registrations given its broad-ranging recordkeeping violations. The order to show cause proposed that Ascent's registration as a manufacturer "should be revoked, and any pending [registration] applications should be denied, because Ascent has committed such acts as would

8

render its registration inconsistent with the public interest," including its "negative past experience in the manufacture of controlled substances" and its "failure to establish effective controls against diversion of Schedule II controlled substances," in violation of 21 U.S.C. §§ 823(a)(5) and 824(a)(4). OSC ¶ 6. The order alleged numerous violations of Ascent's recordkeeping obligations to track and account for the controlled substances that Ascent had been permitted to procure in the past—including millions of dosage units of controlled substances. OSC ¶¶ 7–54. The order also detailed Ascent's failure to "properly maintain records sufficient to account for its manufacture and distribution of controlled substances in a readily retrievable manner," in violation of 21 U.S.C. § 827(b) and 21 C.F.R. § 1304.04(f). OSC ¶ 15. The order concluded that these allegations "constitute egregious misconduct" and "provide grounds to revoke" Ascent's separate registration as an analytical lab to analyze controlled substances as well. OSC ¶ 55.

The order noted that Ascent would have 30 days to file a written request for a hearing or a waiver of hearing with a written statement regarding Ascent's position on the issues in the order. OSC 16. The order also explained that Ascent could submit a corrective action plan, and that the agency will then "decide whether, in view of the plan and the allegations set forth in this Order to Show Cause, the proceedings to revoke Ascent's registration should be discontinued, or deferred for the purposes of modification, amendment, or clarification of such plan." *Id.*

9

On Friday, September 29, 2023, DEA separately issued an initial decision denying Ascent's quota applications. The decision stated that "[i]n considering Ascent's requests for quota, DEA's Diversion Control Division received records pursuant to DEA's authority under 21 CFR 1303.12(b) to request additional information that 'may be helpful in detecting or preventing diversion,'" and that "[a]fter reviewing these records, DEA lacks confidence in the data provided by Ascent in its quota requests, a relevant 'other factor' in reaching quota determinations pursuant to 21 U.S.C. 826(c)." Dkt. No. 2 at 1.

On Tuesday, October 3, 2023, Ascent filed a petition for review of DEA's initial quota denial decision in this Court. The next morning, Ascent filed an emergency motion for mandatory preliminary injunctive relief seeking an order compelling DEA to approve Ascent's quota applications.

## ARGUMENT

### I. The Relief Ascent Seeks Is Not Preliminary And Would Not Be Proper Even If This Court Ultimately Concluded That The Petition Had Merit.

The purpose of an injunction pending appeal is to provide relief that is preliminary while the Court considers the merits of a case. The relief sought here is not preliminary and would be unavailable even if the Court were to determine that the petition had merit. The Court can deny Ascent's motion for these reasons alone.

Based on its assertions that DEA's initial quota denial lacks sufficient reasoning, Ascent's emergency motion for mandatory preliminary injunctive relief

10

asks this Court to "compel DEA to approve Ascent's Quota Applications." Mot. 1–2, 23. The requested injunction is in no sense preliminary, however, for it would give Ascent all the relief it seeks. Ascent would begin using the controlled substances for manufacturing, and the consequences of Ascent's production could not be reversed even if its petition for review is ultimately unsuccessful.

The injunction Ascent seeks would not properly be granted even if Ascent were to prevail on the merits of its claims. Even if this Court were to conclude that it could properly review the agency's initial quota decision, despite the absence of an administrative record and final order from the Administrator, and even if this Court were to conclude that the agency's reasoning was insufficient, the proper course would be to remand the matter to the agency to provide additional reasoning for its decision, not to compel approval of the company's quota applications. *See Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 115 (2d Cir. 2013) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (alteration in original) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985))).

The Court followed the usual course in *Visels Drug Store, Inc. v. DEA*, 593 F. App'x 12 (2d Cir. 2014), a case on which Ascent seeks to rely. *See* Mot. 14, 16. There, the Court reviewed DEA's decision to deny a pharmacy's application for the waiver of a regulation that prohibited the pharmacy from employing an individual with a

11

felony conviction. *See Visels Drug Store*, 593 F. App'x at 13. After reviewing the administrative record, the Court vacated one element of the agency's decision as inadequately reasoned and remanded the matter for further proceedings. *See id.* at 16–17. The Court did not order the agency to grant the substantive relief the pharmacy sought from the agency. In short, there is no basis for granting Ascent's requested injunction pending appeal, which would afford Ascent relief to which Ascent would not be entitled even if Ascent were to prevail on the merits of its claims.

## II. Ascent Does Not Satisfy The Requirements For An Injunction Pending Appeal.

Even if the nature of the relief sought did not compel denial of the motion, it should be denied because Ascent has failed to satisfy any of the prerequisites for an injunction pending appeal. In deciding whether such an injunction is proper, this Court weighs (1) whether the movant "will suffer irreparable injury" absent injunctive relief, (2) whether the opposing party "will suffer substantial injury" if the injunction is issued, (3) whether the movant has demonstrated "'a substantial possibility'" of success on appeal, and (4) "the public interests that may be affected." *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994) (quoting *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir. 1993)).

These factors, individually and collectively, warrant denial of the motion for the same fundamental reason: Ascent filed this emergency motion and petition for review before seeking administrative review of its initial quota denial decision and before the

12

Administrator issued a final order on the quota applications. In the absence of an administrative record and final order from the Administrator, there is no basis for this Court to decide whether Ascent's quota applications should be granted. The potential harm to the public and to DEA's enforcement efforts from an injunction pending appeal is underscored by the agency's order to show cause why Ascent's DEA registrations should not be revoked.

**A.** The Controlled Substances Act creates a comprehensive scheme for administrative and judicial review of a broad range of DEA determinations, including preliminary determinations regarding quota applications and registrations. A manufacturer dissatisfied with DEA's response to its application may request a hearing with the opportunity to present factual evidence and argument. 21 C.F.R. § 1303.34(a). The hearing is overseen by an administrative law judge, who certifies a record and prepares recommended findings of fact and conclusions of law, as well as a recommended decision. *Id.* §§ 1303.31(b), 1316.65(a)–(c). The applicant and agency may file exceptions to the administrative law judge's recommended decision, findings of fact, and conclusions of law. *Id.* § 1316.66(a)–(c). The Administrator issues the final order on the quota application, which includes findings of fact and conclusions of law. *Id.* §§ 1303.37, 1316.67.

Ascent cannot explain how this Court could order DEA to approve its quota request in the absence of an administrative record and a final order from the Administrator, consistent with the statute. Judicial review is predicated on review of

13

the findings of fact and conclusions of law in the Administrator's final order. The Controlled Substances Act specifically provides that "[a]ll final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision" in a federal court of appeals. 21 U.S.C. § 877. On judicial review, "[f]indings of fact by the Attorney General, if supported by substantial evidence, shall be conclusive." *Id.* Ascent cannot properly ask this Court to decide whether its quota should be granted in the absence of an administrative record and the Administrator's final order.

These statutory and administrative review procedures are integral to DEA's ability to carry out its enforcement and oversight mandate. They enable the Administrator to make a final decision based on all the relevant facts and arguments presented to the agency and minimize the risk of erroneous determinations. To the extent Ascent seeks reversal of the agency's initial quota decision, the administrative review procedures allow Ascent to present its case to the agency and seek such relief. And to the extent Ascent seeks additional reasoning from the agency, the administrative review process will produce just that.[2]

---

[2] Ascent has not initiated the administrative process to seek agency review of the initial quota decision, much less sought expedited review of the decision by an administrative law judge. Ascent's repeated assertions that DEA took too much time in issuing the initial decision has no bearing on the question now before the Court. *See, e.g.*, Mot. 3, 20. DEA's initial decision has been issued, and while a court may

*Continued on next page.*

The anomaly of Ascent's argument is underscored insofar as Ascent attacks not only the denial of its quota applications but also the order to show cause. *See, e.g.*, Mot. 16–19. As explained in the order to show cause, Ascent may request a hearing on the order before an administrative law judge and submit additional factual evidence and legal argument addressing the allegations in the order to show cause, following which the agency will issue a final order. OSC 16. Ascent has not yet taken any of these steps with respect to the order to show cause, however.

The decisions on which Ascent relies underscore the lack of support for its position. In *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 735 (D.C. Cir. 2001), the court considered whether a DEA letter denying the petitioner's petition to proceed in forma pauperis was sufficiently reasoned. The parties agreed that the letter represented the agency's final decision and was reviewable under 21 U.S.C. § 877, and the court concluded that even if the letter contained insufficient reasoning, the agency's internal memoranda provided sufficient explanation for the decision. *Tourus Records*, 259 F.3d at 734, 739. Likewise in *Visels Drug Store*, where the Court reviewed DEA's decision to deny a pharmacy's application for the waiver of a regulation based on the administrative record. 593 F. App'x at 13, 16–17. Neither case supports Ascent's extraordinary request for this Court to order DEA to grant Ascent's procurement

---

order an agency to act if a litigant establishes unreasonable delay, delay does not provide a basis for a court order granting substantive relief from the agency. *See* 5 U.S.C. § 706(1).

15

quota requests on the basis of evidence and arguments that have not been presented to DEA through the proper administrative procedures.

**B.** Ascent's requested injunction would also undermine the public interest in DEA's regulation of controlled substances and contravene DEA's enforcement mandate. The Controlled Substances Act directs DEA to protect the public health and welfare by regulating the use of controlled substances to produce pharmaceutical drugs while minimizing the detrimental effects of the illegal manufacture, distribution, possession, and use of these substances. *See* 21 U.S.C. § 801(1)–(2). Toward this end, DEA mains a closed system of distribution for controlled substances and requires a clear accounting of all controlled substance transactions. *See* DEA, *Practitioner's Manual: An Informational Outline of the Controlled Substances Act* 8 (2023), https://perma.cc/D8BT-N55T. Ascent's motion asks this Court to circumvent this regulatory framework by ordering relief that DEA has preliminarily determined Ascent is not entitled to. DEA recognizes that effective regulation should not unnecessarily curtail lawful access to and use of controlled substances, but it also recognizes its mandate to ensure controlled substances are produced and used for lawful purposes.

Ascent nevertheless asserts that the public interest would not be undermined by allowing it to circumvent the administrative review scheme, because DEA's concerns are based on "minor, clerical errors." Mot. 17. That is an assertion that this Court might properly evaluate in a challenge to a final order from the Administrator

16

under 21 U.S.C. § 877, not as part of an effort to avoid seeking a decision from the Administrator. In any event, the order to show cause, to which Ascent repeatedly points, makes clear that the errors are far from "trivial," Mot. 18, as Ascent's records fail to account for millions of dosage units of controlled substances.

Indeed, the recordkeeping violations detailed in the order to show cause illustrate the magnitude of the concerns arising from DEA's reviews of Ascent's records. Among other things, DEA's audit revealed numerous significant discrepancies between the quantities of controlled substances in Ascent's packaging records and the quantities of controlled substances that were shipped according to packing lists, including 84,456 bottles of 100-count methylphenidate 5 mg bottles (8,445,600 dosage units); 113,640 bottles of 100-count methylphenidate 10 mg bottles (1,136,400 dosage units); 147,336 bottles of 100-count methylphenidate 20 mg bottles (14,773,600 dosage units); 103,508 bottles of 100-count hydrocodone/APAP 5 mg/325 mg bottles (10,350,800 dosage units); 48,936 bottles of 500-count hydrocodone/APAP 5 mg/325 mg bottles (24,468,000 dosage units); 29,748 bottles of 100-count oxycodone/APAP 10 mg/325 mg bottles (2,974,800 dosage units); 17,628 bottles of 500-count oxycodone/APAP 10 mg/325 mg bottles (8,814,000 dosage units); and 21,876 bottles of 100-count oxycodone 30 mg bottles (2,187,600 dosage units). OSC ¶¶ 47a–b. DEA's initial quota decision, which was served on Ascent the day after the order to show cause, explained that "[i]n considering Ascent's requests for quota, DEA's Diversion Control Division received records," and that

17

"[a]fter reviewing these records, DEA lacks confidence in the data provided by Ascent in its quota requests, a relevant 'other factor' in reaching quota determinations pursuant to 21 U.S.C. 826(c)." Dkt. No. 2 at 1. Granting Ascent's extraordinary request would in no sense serve the public interest.

## CONCLUSION

This Court should deny petitioner's emergency motion for mandatory injunctive relief.

Respectfully submitted,

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney General*

MARK B. STERN

 *s/ Urja Mittal*
URJA MITTAL
 *Attorneys, Appellate Staff
 Civil Division, Room 7248
 U.S. Department of Justice
 950 Pennsylvania Avenue NW
 Washington, DC 20530
 (202) 353-4895
 urja.mittal@usdoj.gov*

OCTOBER 2023

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,362 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Urja Mittal*
URJA MITTAL