# 23-7246

## United States Court of Appeals
## For the Second Circuit

_____

ASCENT PHARMACEUTICALS, INC.,

*Petitioner,*

v.

UNITED STATES DRUG ENFORCEMENT ADMINISTRATION

*Respondent,*

On Petition for Review of an Order of the U.S. Drug Enforcement Administration

**REPLY MEMORANDUM IN SUPPORT OF PETITIONER'S EMERGENCY MOTION FOR MANDATORY PRELIMINARY INJUNCTIVE RELIEF**

JIM WALDEN
**WALDEN MACHT & HARAN LLP**
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030

*Attorney for Petitioner Ascent Pharmaceuticals, Inc.*

October 23, 2023

## <u>TABLE OF CONTENTS</u>

<u>**Pages**</u>

INTRODUCTION ................................................................................................1

I.      ARGUMENT..........................................................................................2

        A.      The Quota Denial is a Final Order ........................................2

                1.      Finality ........................................................................2

                2.      Legal Consequences....................................................4

        B.      Ascent Was Not Required to Seek Administrative Review..................5

        C.      The Administrative Record is Devoid of Adequate Reasons for
                the Quota Denial..............................................................8

        D.      The Court Has the Authority to Grant the Relief Requested ...............9

CONCLUSION .................................................................................................11

# TABLE OF AUTHORITIES

**Cases**                                    **Pages**

*Able v. United States*,
    88 F.3d 1280 (2d Cir. 1996) .......................................................................7

*Bennett v. Spear*,
    520 U.S. 154 (1997)....................................................................................2

*Bracco Diagnostics, Inc. v. Shalala*,
    963 F. Supp. 20 (D.D.C. 1997).................................................................6, 7

*Brodsky v. U.S. Nuclear Regul. Comm'n*,
    704 F.3d 113 (2d Cir. 2013) .....................................................................10

*Brown v. Secretary of H.H.S.*,
    46 F.3d 102 (1st Cir. 1995)........................................................................8

*Ciba–Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986)...................................................................4

*John Doe, Inc. v. Drug Enf't Admin.*,
    484 F.3d 561 (D.C. Cir. 2007)........................................................ 2, 4, 5, 6

*Morall v. Drug Enf't Admin.*,
    412 F.3d 165 (D.C. Cir. 2005)................................................................9, 10

*Skubel v. Fuoroli*,
    113 F.3d 330 (2d Cir. 1997) ......................................................................6

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
    60 F.3d 27 (2d Cir. 1995) ........................................................................10

*Tourus Records, Inc. v. Drug Enf't Admin.*,
    259 F.3d 731 (D.C. Cir. 2001)...................................................................3

*Visels Drug Store, Inc. v. Drug Enf't Agency*,
    593 F. App'x 12 (2d Cir. 2014)........................................................ 2, 3, 8, 9

*W. Virginia v. Env't Prot. Agency*,
    142 S. Ct. 2587 (2022)..............................................................................11

*Washington v. Barr*,
    925 F.3d 109 (2d Cir. 2019) ...............................................................6

*Watson v. Geren*,
    569 F.3d 115 (2d Cir. 2009) ...........................................................10

**<u>Statutes</u>**

21 U.S.C. § 877 ...........................................................................................2, 5

**<u>Rules</u>**

21 C.F.R. § 1303.34(a)..................................................................................5, 6

**<u>Other Authorities</u>**

Christopher S. Havasy, *Relational Fairness in the Administrative State*,
    109 Va. L. Rev. 749 (2023) ...........................................................11

## <u>INTRODUCTION</u>

Ascent Pharmaceuticals, Inc. ("Ascent") agrees with one point raised by DEA in its response to the pending motion ("Response"): this case is "extraordinary"—but not for the reasons cited by DEA.

DEA's Response concedes that it denied Ascent's quota applications ("Quota Denial") well after the statutory deadline. DEA cites no prior case—nor have we found one—where DEA denied quota to any manufacturer based on record-keeping concerns. More importantly, DEA's Response utterly fails to address its own errors in assessing Ascent's record-keeping—it ignores this issue entirely. And DEA claims that its newly found power to shutter a business without any due process—by denying quota—is unreviewable by a court. In urging this result, DEA ignores the ongoing crisis of scarcity for ADHD drugs, which DEA's erroneous actions have intensified.

This case is extraordinary indeed. As described below, none of DEA's various procedural objections have merit and the Court should grant relief to Ascent.[1]

---

[1] Compelling DEA to grant the quota applications would not provide Ascent full relief, as DEA suggests. It would only provide Ascent with the ability to obtain raw material to manufacture its products. As DEA knows, Ascent agreed to withhold all shipments until DEA inspects each package to assure alignment between DEA Forms 222 and relevant shipping records.

1

## I.  ARGUMENT

DEA raises four arguments.  We address the infirmity of each point below.

### A.    The Quota Denial is a Final Order

DEA argues that this Court cannot review the Quota Denial in the "absence of an administrative record and final order from the Administrator."  (Resp. 11.) This position ignores key authorities.

An administrative hearing is not a prerequisite for judicial review under 21 U.S.C. § 877.  *See John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561, 567 (D.C. Cir. 2007) (court had jurisdiction under 21 U.S.C. § 877 even where petitioner had declined to pursue administrative remedies).  Two conditions must be satisfied for agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature;" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Visels Drug Store, Inc. v. Drug Enf't Agency*, 593 F. App'x 12, 16 (2d Cir. 2014). (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  Both factors are satisfied here.

#### 1.    Finality

The Quota Denial clearly marks the consummation of DEA's decision-making process.  DEA has previously conceded that similar denial letters constituted final determinations.  *See Visels*, 593 F. App'x at 16 (waiver of a regulatory

2

provision); *Tourus Records, Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 734 (D.C. Cir. 2001) (forfeiture decision).

This case presents an even more compelling case for finality than *Visels* and *Tourus*. After waiting nearly 18 months for a decision, Ascent filed a lawsuit on September 27, 2023 in the district court seeking to compel DEA to decide the quota applications.[2] Two days later, DEA issued the Quota Denial, listing each quota request and stating "DENIED" after each one. Jayaraman Decl., Ex. 13, Dkt. No. 8.1 103-05. It explained no recourse for Ascent to appeal. Nothing in the letter indicated that this was a tentative or interlocutory decision. Moreover, Ascent's applications sought quotas for the calendar year 2023, and the denial letter was sent nearly 10 months into the year.

Indeed, Ascent even invited clarification from DEA before filing this action. On September 30, 2023, after receiving the Quota Denial, Ascent sent an email to DEA: "The Denial Letter purports to convey a final decision of the Administrator . . . We are aware of no requirement of further agency-level process. . . If we hear nothing from DEA by [October 2] at 9 am, we will accept that as confirmation that . . . DEA views the quota denial as a final decision by the Administrator, and . . .

---

[2] *See Ascent Pharmaceuticals, Inc. v. U.S. Drug Enf't Admin.*, No. 2:23-cv-07211 (E.D.N.Y. Sep. 27, 2023).

DEA does not take the position that our Court of Appeals petition is unripe or that any further administrative exhaustion is required." DEA did not respond.

Under these circumstances, DEA cannot credibly argue that its decision was somehow preliminary.

## 2.    Legal Consequences

The Quota Denial unquestionably determined Ascent's rights and obligations. Without approved quotas, Ascent can no longer obtain the raw material required to produce and ship its products. Sabbella Decl. ¶10, Dkt. No. 8.1 107. Courts have found that disruption of business activities satisfies the standard for review. *See John Doe,* 484 F.3d at 567 ("[T]he permit denial . . . clearly determined [petitioner's] rights" where it "had a direct and immediate effect on [petitioner's] business."); *Ciba–Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) (agency decision final where it "has a direct and immediate effect on the day-to-day business of the parties challenging the action") (internal quotations omitted).

*John Doe* is squarely on point. There, the D.C. Circuit held that DEA's denial of petitioner's application for an import permit was sufficiently final to confer jurisdiction to the court, notwithstanding a lack of a comprehensive administrative record.[3]  484 F.3d at 566-67. Following denial of the application, the petitioner declined its option to pursue administrative review, despite DEA expressly advising

---

[3] The Court denied the petition on separate grounds.

4

the petitioner that it could request an administrative hearing. *Id.* at 564. Instead, petitioner sought review of DEA's denial in court, but DEA challenged the appeal as to finality. *Id.* The court rejected DEA's arguments, explaining that "DEA's action was not merely tentative, but rather definitive: the DEA affirmatively denied Doe's permit application." *Id.* at 566.

So too here. The Quota Denial plainly constitutes a final denial for the same reasons. DEA's letter "clearly determined [Ascent's] rights," establishing legal consequences by prohibiting acquisition of Ascent's raw materials. More, the Quota Denial had a "direct and immediate effect" on Ascent's business by bringing production nearly to a halt. *Id.* at 567.

While *John Doe* fatally undercuts DEA's argument on finality, it also saps DEA's claim that the absence of an administrative record counsels against review. (*See* Resp. 3.) The court was clear on this point: "[C]oncern over the lack of a comprehensive administrative record is not sufficient cause to narrow the scope of 21 U.S.C. § 877." *John Doe*, 484 F.3d at 569-70. Just as in *John Doe*, the absence of a full administrative record is no obstacle to this Court's review.

### B.    Ascent Was Not Required to Seek Administrative Review

DEA asserts that Ascent was required to request an administrative hearing on the Quota Denial under 21 C.F.R. § 1303.34(a). This is wrong. The applicable

regulation is permissive, not mandatory, just as in the *John Doe* case. *See* 21 C.F.R. § 1303.34(a) (providing a hearing to "[a]ny applicant or registrant who desires" one).

Moreover, the Controlled Substances Act "does not expressly mandate the exhaustion of administrative remedies," and therefore the court has discretion to review DEA's final decision. *Washington v. Barr*, 925 F.3d 109, 115 (2d Cir. 2019). A petitioner's "failure to exhaust administrative remedies can be excused if . . . exhaustion would be futile, or . . . requiring exhaustion would result in irreparable harm." *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997).

Even if Ascent were to request an administrative hearing on the Quota Denial, a hearing cannot provide immediate relief from imminent irreparable harm. Where a petitioner faces "irreparable harm if unable to secure immediate judicial consideration of its claim," as Ascent does, it is not required to pursue all administrative avenues for relief before seeking judicial review. *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 31 (D.D.C. 1997). Hearings on orders to show cause, for example, typically take over a year to reach a resolution,[4] by

---

[4] In 2014, the Office of the Inspector General ("OIG") conducted an examination of DEA's administrative process and "found that the time it took the DEA to reach a final adjudication of registrant actions was very lengthy. Neither federal law nor the DEA's regulations establish timeliness standards. . ." U.S. DOJ OIG, *The Drug Enforcement Administration's Adjudication of Registrant Actions* (2014), available at https://oig.justice.gov/reports/2014/e1403.pdf.

6

which time Ascent would be forced to close its business. *See* Sabella Decl. ¶¶ 8-16, Dkt. No. 8.1 107-108.

*Bracco Diagnostics* is instructive. There, manufacturers of medical products moved for a preliminary injunction against the Food and Drug Administration ("FDA"), which subjected its products to a more onerous review than those of its competitors. 963 F. Supp. at 22. Granting the preliminary injunction, the court found that plaintiffs were not required to exhaust administrative remedies because they were "faced with irreparable harm" to the economic prospects of its business. *Id.* at 31. The court recognized that the "time and person power spent, as well as the millions of dollars in costs," to develop plaintiffs' products are "indeed significant and irreparable losses." *Id.* at 28. So too here. Without immediate relief, Ascent will be forced to shut down its business and will no longer be able to help alleviate the ADHD medication shortage.

Even apart from irreparable harm, a hearing here would be futile. DEA has already determined the issue. *See Able v. United States*, 88 F.3d 1280, 1289 (2d Cir. 1996) (finding futility where there was "no realistic possibility" the agency will change its position). DEA not only denied the quota applications, but it also issued the order to show cause ("OTSC") seeking to revoke Ascent's registrations. Its position is clear. During the 18-month audit, Ascent provided explanations and clarifications to DEA for many of the alleged discrepancies. *See* Jayaraman Decl. ¶

7

38, Dkt. No. 8.1 37.  DEA ignored each of these explanations, and its own errors, and issued the OTSC anyway.  An administrative hearing would, under the circumstances, leave Ascent in "the same posture."  *Brown v. Secretary of H.H.S.*, 46 F.3d 102, 115 (1st Cir. 1995) (finding futility where the agency has "taken a firm stand").

### C.    The Administrative Record is Devoid of Adequate Reasons for the Quota Denial

On its face, the Quota Denial provides no reason or explanation for DEA's decision.  Absent an adequate rationale, the Court should find DEA's decision to be arbitrary and capricious.  *See Visels*, 593 F. App'x at 16 (agency decision arbitrary and capricious if court "cannot conclude from the record that the agency examined the relevant data and articulated a satisfactory explanation for its action").

To the extent the Quota Denial implicitly relies on the OTSC, its key conclusions rest on four categories of serious errors, as Ascent explained in its motion.  (*See* Mot. 16-18.)  In its Response, DEA failed to address any of those errors.  For this reason alone, the Court should reject DEA's position.

Instead, DEA points to allegations in one paragraph of the OTSC—paragraph 47—to restate DEA's conclusion that Ascent's shipping records fail to align with its DEA Forms 222, such that "millions of dosage units" are unaccounted for.  In its cursory reliance on OTSC ¶ 47, DEA leans into another error.  Again, DEA appears to have compared Ascent's shipping records to draft—not final—versions of the

8

DEA Forms 222. When the final DEA Forms 222 are compared against the shipping and packing forms, no discrepancies exist for any of the eight cited examples. Jayarman Decl. ¶¶ 4(a)-(h). For this reason, the Court should reject DEA's unsworn and unfounded assertion. *See Visels*, 593 F. App'x at 16.

Unlike Ascent, DEA could have submitted a declaration or supporting documents to demonstrate the alleged discrepancies—but it did not. We are not surprised. In the context of an OTSC riddled with errors, where DEA has alleged discrepancies based on, among other things, examination of the wrong forms (*see* Mot. 17), DEA's bald claim of "discrepancies" cannot be credited.

### D.    The Court Has the Authority to Grant the Relief Requested

DEA wrongly asserts that—even if the Court finds DEA's final decision to be arbitrary and capricious—it cannot compel DEA to grant the quota applications. DEA cites no authority for its position.

The court in *Morall v. Drug Enf't Admin.,* 412 F.3d 165, 166-67 (D.C. Cir. 2005), did otherwise. There, the court reversed DEA's decision to revoke a physician's license after an administrative hearing. *Id.* at 184. On review, the court found that the administrator "entirely ignored relevant evidence," and that the agency made "stunningly one-sided" conclusions, and therefore the decision was arbitrary and capricious. *Id*. at 167, 178. The court vacated the agency decision and remanded the matter for "a prompt disposition . . . consistent with this opinion,"

9

effectively compelling DEA to reinstate the license. *Id.* at 184; *see also Watson v. Geren*, 569 F.3d 115, 134-35 (2d Cir. 2009) (affirming district court decision to grant doctor's application for military discharge, where Army had denied it, rather than remand to Army, because "the record contains no basis in fact for denial of the application on any valid ground" and remand would be "futile").

To support its frail argument, DEA relies on *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 115 (2d Cir. 2013), which is inapposite and did not involve a request for emergency relief. There, with respect to one claim, the court directed the district court to remand the matter to the agency to supplement the administrative record on its decision to deny public involvement in the decision-making process. *Id.* at 125. The court expressly noted that its decision was "narrow" and only reached "on the record presented in this case." *Id.* This case is easily distinguishable.

The need for mandatory judicial relief is especially acute here given the irreparable harms Ascent and ADHD patients face. *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995) (affirming mandatory preliminary injunction, explaining that "the fact that the plaintiff would get no additional relief if he prevailed at the trial on the merits should not deprive him of his remedy").

This matter showcases the dangers of an unchecked administrative agency. DEA has effectively created a new means to terminate a business without any due

process and now claims it should be able to do so free from judicial review. Courts and legal scholars have increasingly expounded on the dangers of an expansive administrative state. *See, e.g.*, Christopher S. Havasy, *Relational Fairness in the Administrative State*, 109 Va. L. Rev. 749, 754 (2023). Recent Supreme Court decisions have reined agencies in. *See, e.g., W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2605, 2607-09 (2022) (administrative agencies may not promulgate rules of "vast economic and political significance" without clear congressional authorization).

DEA's unjustified actions have placed Ascent and the public health in imminent danger, which can only be remedied by mandatory injunctive relief.

## CONCLUSION

For the foregoing reasons, this Court should compel DEA to approve Ascent's quota applications.

Dated: New York, NY
         October 23, 2023

Respectfully submitted,

**WALDEN MACHT & HARAN LLP**

By:    /s/        *Jim Walden*
       Jim Walden
       250 Vesey Street, 27th Floor
       New York, NY 10281
       Tel: (212) 335-2030
       jwalden@wmhlaw.com

       *Counsel for Petitioner Ascent*
       *Pharmaceuticals, Inc.*

11

## <u>CERTIFICATE OF COMPLIANCE</u>

Jim Walden, an attorney at Walden Macht & Haran LLP, hereby certifies that this reply complies with the typeface and volume limitations of Rules 27 and 32 of the Federal Rules of Appellate Procedure because this motion contains 2,476 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(d), and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, in accordance with Fed. R. App. P. 32(a)(5)-(6).

Dated:  New York, NY
          October 23, 2023

                         /s/           *Jim Walden*
                                 Jim Walden

## <u>CERTIFICATE OF SERVICE</u>

Jim Walden, an attorney at Walden Macht & Haran LLP, hereby certifies that on October 23, 2023, the foregoing Reply Memorandum in support of Petitioner's Emergency Motion for Mandatory Preliminary Injunctive Relief was filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated:  New York, NY
         October 23, 2023

                                        /s/          *Jim Walden*
                                                     Jim Walden

23-7246

**ASCENT PHARMACEUTICALS, INC.**

*Petitioner*,

v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,**

*Respondent*.

## DECLARATION OF VENKATASUBRAMANIAN JAYARAMAN

Venkatasubramanian Jayaraman, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury, as follows:

1.    I submit this declaration to supplement my original declaration filed on October 4, 2023, in support of Ascent Pharmaceuticals, Inc.'s ("Ascent"), Emergency Motion for Mandatory Injunctive Relief.  Dkt. No. 8.1.

2.    I am the Director and Head of Quality Assurance at Ascent and have served in that role since February 2014.  I also serve as Ascent's Drug Enforcement Administration ("DEA") Compliance Officer, a role I have held since July 2022.

3.    In its Response to Ascent's Emergency Motion ("Response"), DEA claimed there were "numerous significant discrepancies between the quantities of controlled substances in Ascent's packaging records[1] and the quantities of controlled substances that were shipped according to packing lists."  It cited to the claims in Paragraph 47 of its Order to Show Cause.

---

[1] Batch packaging records show that the amount of product manufactured from a particular batch is accounted for when compared to the amount of finished product from the batch.

4.      DEA provided eight examples from Paragraph 47.  For each of DEA's cited examples, I have carefully reviewed the batch packaging records, completed Original DEA Forms 222, and packing slips that Ascent produced to DEA.  As described below, the records contain the exact same number of bottles and show no discrepancies.

 a.  DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Methylphenidate 5 mg 100-count** in the amount of 84,456 bottles.  This is incorrect.  Between December 31, 2020 and May 3, 2022, Ascent shipped a total of 273,816 bottles, which is confirmed by the batch packaging records, completed Original DEA Forms 222, and packing lists Ascent provided to DEA.

 b.  DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Methylphenidate 10 mg 100-count** in the amount of 113,640 bottles.  This is incorrect.  Between December 31, 2020 and May 3, 2022, Ascent shipped a total of 436,656 bottles, which is confirmed by the batch packaging records, completed Original DEA Forms 222, and packing lists Ascent provided to DEA.

 c.  DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Methylphenidate 20 mg 100-count** in the amount of 397,752 bottles. This is incorrect.  Between December 31, 2020 and May 3, 2022, Ascent shipped a total of 397,752 bottles, which is confirmed by the batch packaging records, completed Original DEA Forms 222, and packing lists Ascent provided to DEA.

 d.  DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Hydrocodone/APAP 5 mg 100-count** in the amount of 103,508 bottles.  This is incorrect.   Between December 31, 2020 and August 1, 2022, Ascent shipped a total of 1,981,728 bottles, which is confirmed by the batch packaging records, completed Original DEA Forms 222, and packing lists Ascent provided to DEA.

 e.  DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Hydrocodone/APAP 5 mg 500-count** in the amount of 48,936 bottles.  This is incorrect.  Between December 31, 2020 and August 1, 2022, Ascent shipped a total of 18,708 bottles, which is confirmed by the batch packaging records, completed Original

DEA Forms 222, and packing lists Ascent provided to DEA.

 f. DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Oxycodone/APAP 10 mg 100-count** in the amount of 29,738 bottles. This is incorrect. Between December 31, 2020 and August 1, 2022, Ascent shipped a total of 392,256 bottles, which is confirmed by the batch packaging records, completed Original DEA Forms 222, and packing lists Ascent provided to DEA.

 g. DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Oxycodone/APAP tablets 10/325mg 500-count** in the amount of 17,628 bottles. This is incorrect. Between December 31, 2020 and August 1, 2022, Ascent shipped a total of 146,844 bottles, which is confirmed by the batch packaging records, completed Original DEA Forms 222, and packing lists Ascent provided to DEA.

 h. DEA claimed that there was a discrepancy between the batch packaging records and the packing lists for **Oxycodone 30 mg 100-count** in the amount of 21,876 bottles. This is incorrect. Between December 31, 2020 and August 1, 2022, Ascent shipped a total of 180,216 bottles, which is confirmed by the batch packaging records, completed Original DEA Forms 222, and packing lists Ascent provided to DEA.

 5. DEA has provided Ascent only its final conclusions and has not explained its methodology or the calculations it used to conclude there were discrepancies.

Respectfully submitted this 23rd Day of October, 2023.

/s/ *Venkatasubramanian Jayaraman*
Venkatasubramanian Jayaraman